Marc M. Seltzer (SBN 54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Ian B. Crosby (admitted *pro hac vice*)
icrosby@susmangodfrey.com
Daniel Shih (admitted *pro hac vice*)
dshih@susmangodfrey.com
Katherine M. Peaslee (SBN 310298)
kpeaslee@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

*Attorneys for Defendants Zillow Group, Inc., and Zillow, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York Corporation,<br><br>Plaintiff,<br><br>v.<br><br>ZILLOW GROUP, INC., a Washington Corporation, ZILLOW, INC., a Washington Corporation,<br><br>Defendants. | Case No. 8:19-CV-01777-JLS-JDE<br><br>**ZILLOW'S REPLY IN SUPPORT OF ITS MOTION TO STRIKE IBM'S INFRINGEMENT CONTENTIONS AND STAY PATENT LOCAL RULE DEADLINES AND OTHER DISCOVERY FROM ZILLOW**<br><br>NOTED FOR HEARING: May 1, 2020 at 10:30 A.M., before the Hon. Josephine L. Staton |

# TABLE OF CONTENTS

I.   IBM'S INFRINGEMENT THEORIES ...........................................................................1

   A.  IBM fails to justify its failure to identify infringing instrumentalities as required

      under the Patent Local Rules. ........................................................................... 1

   B.  IBM cannot avoid its obligations under Rule 3-1 by reframing Zillow's motion as an

      argument on the merits. ..................................................................................... 4

II.  IDENTIFICATION OF ACCUSED INSTRUMENTALITIES ...................................5

III.  UNCHARTED ELEMENTS OF ASSERTED CLAIMS ...........................................7

   A.  The '849 Patent ................................................................................................. 7

   B.  The '346 Patent ............................................................................................... 10

   C.  The '443 Patent ............................................................................................... 12

   D.  The '389 Patent ............................................................................................... 14

   E.  The '904 Patent ............................................................................................... 16

   F.  The '789 Patent ............................................................................................... 17

   G.  The '183 Patent ............................................................................................... 18

IV.  IBM'S ALTERNATIVE THEORIES .....................................................................21

   A.  IBM improperly relies on representative charts. ............................................ 21

   B.  IBM's indirect and attributed infringement contentions are insufficient ................... 22

   C.  IBM improperly asserts the doctrine of equivalents. ..................................... 23

V.  DISCOVERY SHOULD BE STAYED .....................................................................24

VI.  AMENDMENT FOR GOOD CAUSE.......................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. GNC Corp. v. GoPro, Inc.*,
No. 18-CV-00968-BAS-BLM, 2018 WL 6074395 (S.D. Cal. Nov. 6, 2018) ..............5

*Cap Co., Ltd. v. McAfee, Inc.*,
No. 14-cv-05068, 2015 WL 4734951 (N.D. Cal. Aug. 10, 2015)..............................23

*Comcast Cable Commc'ns, LLC v. OpenTV, Inc.*,
No. 16-cv-06180, 2017 WL 2630088 (N.D. Cal. June 19, 2017) .................................4

*Convolve, Inc. v. Compaq Computer Corp.*,
812 F.3d 1313 (Fed. Cir. 2016) ...........................................................................11, 19

*Dynamic Digital Depth Research Pty. Ltd. v. LG Elecs., Inc.*,
No. 15-cv-5578, 2016 WL 7444567 (C.D. Cal. Aug. 30, 2016)...................................4

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) .................................................................................14

*Finjan, Inc. v. Blue Coat Sys. LLC*,
230 F. Supp. 3d 1097 (N.D. Cal. 2017)................................................................4, 12

*Finjan, Inc. v. Check Point Software Techs., Inc.*,
No. 18-CV-02621-WHO, 2019 WL 7801443 (N.D. Cal. Aug. 12, 2019)...............6, 9

*Finjan, Inc. v. Proofpoint, Inc.*,
No. 13-CV-05808-HSG, 2015 WL 1517920 (N.D. Cal. Apr. 2, 2015) .................2, 25

*Finjan, Inc. v. SonicWall, Inc.*,
No. 17CV04467BLFVKD, 2019 WL 2077849 (N.D. Cal. May 10, 2019) .................9

*Finjan, Inc. v. Sophos, Inc.*,
No. 14-CV-01197-WHO, 2015 WL 5012679 (N.D. Cal. Aug. 24, 2015)......12, 24, 25

*Finjan, Inc. v. Zscaler, Inc.*,
No. 17-CV-06946-JST, 2019 WL 7589210 (N.D. Cal. Feb. 5, 2019) .......................10

*France Telecom, S.A. v. Marvell Semiconductor, Inc.*,
No. 12-cv-04967, 2013 WL 1878912 (N.D. Cal. May 3, 2013)
.....................................................................................................................3, 16, 19, 23

ii

*FusionArc, Inc. v. Solidus Networks, Inc.*,
No. 06-cv-06760, 2007 WL 1052900 (N.D. Cal. Apr. 5, 2007) ............................4, 26

*Geovector Corp. v. Samsung Elecs. Co.*,
No. 16-CV-02463-WHO, 2017 WL 76950 (N.D. Cal. Jan. 9, 2017) .............5, 6, 9, 14

*IBM Corp. v. Booking Holdings Inc.*,
No. 2018-1574, Slip Op. (Fed. Cir. May 22, 2019)....................................................10

*InterTrust Tech. Corp. v. Microsoft Corp.*,
2003 WL 23120174 (N.D. Cal. Dec. 1, 2003)...............................................................2

*KlausTech, Inc. v. Google LLC*,
No. 10CV05899JSWDMR, 2018 WL 5109383 (N.D. Cal. Sept. 14, 2018)..............15

*Micro Motion, Inc. v. Kane Steel Co., Inc.*,
894 F.2d 1318 (Fed. Cir. 1990) ...................................................................................1

*Netflix, Inc. v. Rovi Corp.*,
No. 11CV06591PJHDMR, 2015 WL 5752432 (N.D. Cal. Apr. 6, 2015) ...............5, 6

*Netlist, Inc. v. Smart Storage Sys. Inc.*,
No. 13-cv-05889, 2014 WL 1320325 (N.D. Cal. Apr. 1, 2014) ...................................3

*Network Caching Tech. LLC v. Novell Inc.*,
No. C-01-2079-VRW, 2002 WL 32126128 (N.D. Cal. Aug. 13, 2002)........................3

*Oracle Am., Inc. v. Google, Inc.*,
No. 10–3561 WHA, 2011 WL 4479305 (N.D. Cal. Sept. 26, 2011) ...........................7

*Phonometrics, Inc. v. Econ. Inns of Am.*,
349 F.3d 1356 (Fed. Cir. 2003) ...................................................................................5

*Ricoh Co. v. Quanta Computer Inc.*,
550 F.3d 1325 (Fed. Cir. 2008) .................................................................................14

*Shared Memory Graphics LLC v. Apple, Inc.*,
812 F.Supp.2d 1022 (N.D. Cal. 2010)............................................................3, 25, 26

*SpeedTrack, Inc. v. Amazon.com, Inc.*,
No. 4:09-cv-04479, 2018 WL 3328423 (N.D. Cal. July 6, 2018)................................4

*Sung v. Shinhan Diamond Am., Inc.*,
No. CV 14-00530 MWF (EX), 2015 WL 12681306 (C.D. Cal. June 9, 2015) ........1, 2

*Theranos, Inc. v. Fuisz Pharma LLC*,
  No. 11-CV-05236-YGR, 2012 WL 6000798 (N.D. Cal. Nov. 30, 2012)....................26

*Whittlestone, Inc. v. Handi-Craft Co.*,
  618 F.3d 970 (9th Cir. 2010) ..........................................................................................4

*Xiaohua Huang v. Nephos Inc.*,
  No. C 18-06654 WHA, 2019 WL 5892988 (N.D. Cal. Nov. 12, 2019) ........................2

**Rules**

N. D. Cal. P.L.R. 3-1........................................................................................*passim*

Local Rule 3-6...................................................................................................26

IBM's Response to Zillow's Motion is as long on excuses for the failures of its infringement contentions as it is short on credible explanations of how those contentions comply with Patent Local Rule 3-1. The excuses, ranging from the lack of discovery to which IBM is not yet entitled to the complaint that "Zillow knows" what IBM is talking about, fail to justify omissions that IBM often concedes. IBM's explanations repeatedly misrepresent the contents of its contentions in ways that vary from subtle to egregious.

IBM's attempt to blame Zillow for its own inability to articulate its claims of infringement without the aid of discovery is particularly troubling. The hook for that complaint was a motion to compel that has now been denied. But Judge Early's criticism of IBM's "Ready–Fire–Aim approach" to discovery in his ruling shines a harsh light on the present exercise. ECF No. 91 at 5. The sheer volume of pages IBM has provided says nothing about the sufficiency of their content. But it has placed an enormous burden on Zillow and now the Court in sorting them out. IBM's repeated complaint that Zillow is prematurely raising "merits arguments" invites the Court to throw up its hands rather than determine whether there is quality within all that quantity before permitting IBM to bull forward with the vast scope of litigation it envisions. In this light, IBM's accusation that Zillow has taken a "kitchen-sink approach" to its motion smacks of projection. The volume of Zillow's complaints about IBM's contentions reflect the lack of rigor that IBM invested in their preparation, nothing more. The Court should strike them and stay discovery from Zillow until IBM has tendered sufficient contentions after first seeking leave of the Court in a separate motion that shows good cause for IBM to amend.

## I.    IBM'S INFRINGEMENT THEORIES

### A.    IBM fails to justify its failure to identify infringing instrumentalities as required under the Patent Local Rules.

Despite IBM's urging, "[p]laintiffs simply cannot use discovery to establish their infringement theory." *Sung v. Shinhan Diamond Am., Inc*., No. CV 14-00530 MWF (EX), 2015 WL 12681306, at *5 (C.D. Cal. June 9, 2015) (citing *Micro Motion, Inc. v. Kane Steel Co., Inc*., 894 F.2d 1318, 1327 (Fed. Cir. 1990)). Allowing a plaintiff to proceed

without strict adherence to the claim-by-claim identification requirement of the Patent Local Rules would "pass their burden to Defendants by requiring [the] matter to proceed with Defendants' responsive theories." *Id.* As courts applying the Northern District of California's Patent Local Rules have stated, "[t]his is simply impermissible under Patent Local Rule 3-1." *Id.*; s*ee InterTrust Tech. Corp. v. Microsoft Corp*., 2003 WL 23120174, at *3 (N.D. Cal. Dec. 1, 2003) ("The purpose of Patent Local Rule 3–1, [ ] is in fact to be nit picky, to require a plaintiff to crystalize its theory of the case and patent claims."). It is not a "catch-22" to require IBM to satisfy PLR 3-1 based on publicly available information. Resp. at 5. It is the fundamental premise of the rule.

IBM misconstrues case law about "reasonable notice" under PLR 3-1 in claiming that Zillow seeks "evidence" rather than identification of alleged infringement. Demanding that IBM show—explicitly and factually—"where … each limitation of each asserted claim is found" within each accused Zillow product is not a demand that IBM prove its case, but precisely the "notice" that PLR 3-1 requires. N.D. Cal. P.L.R. 3-1(c); *see Xiaohua Huang v. Nephos Inc*., No. C 18-06654 WHA, 2019 WL 5892988, at *3 (N.D. Cal. Nov. 12, 2019) (emphasizing language of PLR 3-1(c) and stating, "[t]o repeat, that means that plaintiff must specifically tie the asserted claim language to some feature within the accused product"). IBM's claim that in using the rule's own word Zillow has asked it to "identify geographically 'where' an infringing functionality occurs" is bizarre. Resp. at 5.

The case law IBM selectively quotes does not support its suggestion that the force of PLR 3-1 is lessened because IBM has not yet reviewed Zillow's non-public source code. *See* Resp. at 3. "[T]he flexibility provided in cases involving software patents does not mean that a party may delay providing any comprehensible theory of infringement until that source code is provided." *Finjan, Inc. v. Proofpoint, Inc*., No. 13-CV-05808-HSG, 2015 WL 1517920, at *9 (N.D. Cal. Apr. 2, 2015). In those cases too, PLR 3-1 "requires that a plaintiff compare an accused product to its patents on a claim by claim, element by element basis for at least one of each defendant's products." *Id*. (quoting *Network Caching Tech. LLC v. Novell Inc*., No. C-01-2079-VRW, 2002 WL 32126128, at *5 (N.D. Cal. Aug.

1   13, 2002)). Accordingly, in *Network Caching*, the court found a plaintiff's infringement
2   contentions "plainly insufficient" despite its recognition that the plaintiff need not identify
3   the infringing routines in defendant's source code. 2002 WL 32126128 at *6–7.

4        None of IBM's cited cases support its attempt to carve out a software-case exception
5   to Rule 3-1's explicit requirements. In particular, the statement in *France Telecom, S.A. v.*
6   *Marvell Semiconductor, Inc.*, No. 12-cv-04967, 2013 WL 1878912, at *4 (N.D. Cal. May
7   3, 2013), that a plaintiff must chart infringement with "as much specificity as possible with
8   the information currently available to it" does not excuse IBM from identifying
9   "specifically where and how each limitation of each asserted claim is found" within a
10  Zillow product. The issue in that case was whether the plaintiff could satisfy this
11  requirement by charting its claims against the wireless standards that the defendant's
12  product implemented. *Id.* The contentions were sufficient precisely because they
13  "reveal[ed] 'element by element' France Telecom's theory of Marvell's infringement."
14  2013 WL 1878912, at *4. Far from suggesting that IBM can defer charting some claim
15  elements until it gets discovery, *France Telecom* reinforces that PLR 3-1 requires a plaintiff
16  to either provide a sufficient disclosure with available information, or not assert a claim.

17       *Netlist, Inc. v. Smart Storage Sys. Inc.*, No. 13-cv-05889, 2014 WL 1320325 (N.D.
18  Cal. Apr. 1, 2014), also does not support ignoring the plain text of PLR 3-1. *Netlist* cited
19  *Shared Memory*'s holding that a patent plaintiff "must map specific elements of
20  Defendants' alleged infringing products onto the Plaintiff's claim construction" and found
21  that this standard had been satisfied where, absent a publicly available product to examine,
22  the plaintiff stated how it believed discovery would show certain claims mapped onto the
23  accused product. *Id.* at *2–3 (quoting *Shared Memory Graphics LLC v. Apple, Inc.*, 812
24  F.Supp.2d 1022, 1025 (N.D. Cal. 2010)). The *Netlist* court did not relieve a plaintiff of its
25  obligation to fully explain its theory of infringement in accordance with the Patent Local
26  Rules, even where—as in that case—the accused product was not publicly available.

27       The rest of IBM's cases just stand for the proposition that a patent plaintiff need not
28

1   prove actual infringement in its infringement contentions.[1] But that is not Zillow's position.

2   None of IBM's cases obviate its duty to identify "where and how each limitation of each

3   asserted claim is found within each Accused Instrumentality" for each claim and element

4   sufficiently for Zillow to understand IBM's theories of infringement.

5   **B.   IBM cannot avoid its obligations under PLR 3-1 by reframing Zillow's**

6   **motion as an argument on the merits.**

7   IBM is dead wrong in accusing Zillow of prematurely arguing the merits in seeking

8   to strike contentions that contradict final rulings against IBM in past cases. Resp. at 6–7.

9   The purpose of a motion to strike is "to avoid the expenditure of time and money that must

10   arise from litigating spurious issues by dispensing with those issues prior to

11   trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (quotation

12   omitted). Courts do indeed grant motions to strike contentions to bar a party from asserting

13   infringement where issue preclusion applies. *See, e.g.*, *Finjan, Inc. v. Blue Coat Sys. LLC*,

14   230 F. Supp. 3d 1097, 1102-04 (N.D. Cal. 2017).[2]

15   In particular, IBM is barred by issue preclusion from asserting theories that

16   contradict prior constructions of overlapping claims in a suit to which it was a party—

17   indeed, the Federal Circuit has upheld an award of sanctions against a party for pursuing

18   an infringement theory based on a construction that it was collaterally estopped from

19   ---

20   [1] *See Comcast Cable Commc'ns, LLC v. OpenTV, Inc.*, No. 16-cv-06180, 2017 WL 2630088, at *2 (N.D. Cal. June 19, 2017) ("PLR 3-1 as a whole makes clear that it requires

21   *specific allegations* but not *evidence* of infringement at the disclosure stage" (emphases in original)); *Dynamic Digital Depth Research Pty. Ltd. v. LG Elecs., Inc.*, No. 15-cv-5578, 2016 WL 7444567, at *2 (C.D. Cal. Aug. 30, 2016) (Rule 3–1 does not "require a plaintiff

22   to prove its infringement case"); *FusionArc, Inc. v. Solidus Networks, Inc.*, No. 06-cv-06760, 2007 WL 1052900, at *2 (N.D. Cal. Apr. 5, 2007) (declining to strike contentions

23   because plaintiff had "'link[ed]' its contentions regarding Solidus's accused systems to the claims of the patent" as required and the Patent Local Rules are not "a mechanism for

24   resolving the *merits* of the parties' dispute" (emphasis in original)); *SpeedTrack, Inc. v. Amazon.com, Inc.*, No. 4:09-cv-04479, 2018 WL 3328423, at *4 (N.D. Cal. July 6, 2018)

25   (declining to allow defendant to use "nonpublic source code" to argue that the plaintiff's

26   infringement contentions were factually incorrect).

27   [2] The magistrate judge's statement in *SpeedTrack* that deciding whether a prior claim construction bound the parties would be "premature" not only contradicts district court

28   authority, but is also *dicta*, since it also found that such a determination would be "outside of the purview of the discovery referral." 2018 WL 3328423, at *4.

1 pursuing. *Phonometrics, Inc. v. Econ. Inns of Am.*, 349 F.3d 1356, 1364 (Fed. Cir. 2003).

2 And even were this not the case, the prior construction of terms of the same patent asserted

3 by IBM will at the very least provide important background to the Court's construction

4 here. *See, e.g., Am. GNC Corp. v. GoPro, Inc*., No. 18-CV-00968-BAS-BLM, 2018 WL

5 6074395, at *24 (S.D. Cal. Nov. 6, 2018) (stating "[u]niformity in claim construction is an

6 important consideration in patent litigation," and courts appropriately consider "claim

7 constructions orders issued by [another district court] on the overlapping patent-in-suits for

8 their persuasive value, consistent with the goal of uniformity in claim construction"

9 (collecting cases)). Given this, "reasonable notice" of IBM's theory of infringement

10 requires either that IBM's contentions account for such prior constructions of overlapping

11 patents in cases to which it was a party or, alternatively, that IBM's disclosure be sufficient

12 for Zillow to understand the different claim scope it now advocates as necessary to enable

13 Zillow to locate relevant prior art and identify claims for construction. *See, e.g., Geovector*

14 *Corp. v. Samsung Elecs. Co*., No. 16-CV-02463-WHO, 2017 WL 76950, at *3 (N.D. Cal.

15 Jan. 9, 2017) ("Patent Local Rule 3-1 is intended to require the plaintiff 'to crystallize its

16 theories of the case early in the litigation and to adhere to those theories once disclosed.'"

17 (citation omitted)); *see also* N.D. Cal. P.L.R. 3-3(a) (requiring defendant to produce alleged

18 anticipatory prior art in response to Rule 3-1 infringement contentions). IBM cannot avoid

19 its disclosure obligations by failing to take a clear position.

20 **II.    IDENTIFICATION OF ACCUSED INSTRUMENTALITIES**

21     Patent Local Rule 3-1(b) requires a plaintiff to "state with specificity the accused

22 instrumentalities." *Netflix, Inc. v. Rovi Corp.*, No. 11CV06591PJHDMR, 2015 WL

23 5752432, at *3 (N.D. Cal. Apr. 6, 2015). IBM claims to have satisfied this requirement by

24 purportedly "identify[ing] accused products *by name*," Resp. at 7 (emphasis by IBM); but

25 the "products" IBM claims to identify *are not discrete Zillow products*. Rather, several—

26 "Zillow's Premier Agent service," "Zillow's www.zillowgroupmedia.com website and

27 associated service," "the Zillow Offers service," and "Zillow's Promoted Communities,"

28 represent groupings of products and services. IBM's own definitions illustrate the point:

Its definition of "Zillow's Premier Agent" services, for instance, includes unspecified "subdomains," unenumerated "mobile applications for accessing" the Premier Agent services, and any "relevant webpages" through which these services can be accessed—whatever "relevant" might mean. Ex. Z at 3.[3]

IBM's claim that Zillow must know what these terms mean because it uses them itself, Resp. at 8, ignores that Zillow's usage does not denote an "apparatus, product, device, process, method, act, or other instrumentality" of the type that PLR 3-1(b) requires IBM to specifically name. *See Finjan, Inc. v. Check Point Software Techs., Inc.*, No. 18-CV-02621-WHO, 2019 WL 7801443, at *5 (N.D. Cal. Aug. 12, 2019) (striking contentions that identified an accused instrumentality by "a marketing term and not a product itself"). Moreover, what IBM supposes Zillow "knows" has no bearing on the sufficiency of its contentions. *See Geovector Corp.*, 2017 WL 76950, at *7 ("GeoVector cannot rely on what it believes Samsung understands to support the sufficiency of its infringement contentions: the infringement contentions must meet the Local Rules' objective requirements.").

Similarly, IBM's definition of "Zillow's Website" to encompasses unspecified "subdomains," "back-end services" and "related webpages," including a laundry list of pages that provide disparate functions and services, Ex. Z at 1, lumps all of Zillow's consumer-facing services and the infrastructure that supports them into a "product name" of IBM's own invention. The name does not put Zillow on notice of what IBM is accusing. *See Netflix,* 2015 WL 5752432, at *4 (finding plaintiff's "all-encompassing" identification of an accused instrumentality as "Netflix Hardware/Software" improper where the definition "capture[d] the entire Netflix service, from head to toe"). Listing unspecified "related" webpages along with all subdomains and elements of Zillow's back-end broadens, rather than narrows, IBM's catch-all term. *See* Resp. at 8. Rule 3-1(b) does "not tolerate broad categorical identifications." *Oracle Am., Inc. v. Google, Inc.*, No. 10–3561 WHA, 2011 WL 4479305, at *2 (N.D. Cal. Sept. 26, 2011).

Finally, IBM excuses its attempt to categorically sweep "prior versions" of Zillow's

---

[3] All Exhibits are attached to the Declaration of Katherine M. Peaslee (ECF No. 80-2).

products and services into the accused instrumentalities without identifying them by claiming they do not have numbered versions. Resp. at 9. But that is not accurate. The Zillow Real Estate & Rentals mobile application for Apple, for instance, is released by numbered version, as is the comparable application for Android. *See* App Store Preview, Zillow Real Estate & Rentals, *available at* https://apps.apple.com/us/app/zillow-real-estate-rentals/id310738695 (identifying current application as "Version 13.2.4" and providing "Version History"); Google Play, Zillow: Find Houses for Sale & Apartments for Rent, *available at* https://play.google.com/store/apps/details?id=com.zillow.android.zillowmap&hl=en_US (listing "Current Version" as "11.4.414.10266").

## III.   UNCHARTED ELEMENTS OF ASSERTED CLAIMS

### A.   The '849 Patent

IBM does not deny that its contentions repeat the claim language in asserting that "Zillow structures the applications as data." Resp. at 9. Its non-limiting list of data types that applications may *be structured as* does not identify what *action* it accuses of corresponding to the *step* of structuring. IBM cannot contend that rendering applications into *any* data format structures them "so that they may be presented through the network, at a first portion of one or more screens of display." *See* Ex. A at 28. Nor do IBM's examples "explain" how Zillow structures its applications in this way. The "portion in blue" encompassing the entire browser window displaying a Zillow property search results page denotes the "first portion of one or more screens of display," *id*. at 28–29, not any aspect of the page structure that causes it to be displayed there. And IBM's contentions do not disclose what the highlighting of the "<div>" tags signify in the HTML excerpt that follows. *Id.* at 29.

IBM's brief also stops short of actually stating that Zillow performs the structuring step by placing <div> tags in HTML pages. Resp. at 9. Its failure to do so attempts to hedge against being pinned down on this element in the event its equivalent is present in the prior art, and to secure a license to fish through the entire stack of software that generates the search results page for alternative theories of structuring that the prior art may not teach. It

is precisely to foreclose such gamesmanship that PLR 3-1 entitles Zillow to a plain disclosure of IBM's theory for this and every element of its asserted claims.

IBM's contentions do not refer to "'HTML, JavaScript, JSON files, CSS files, [and] images' objects" [*sic*], or assert that such files show how "Zillow meets the element of 'configuring the advertising as objects ….'" Resp. at 9 (alteration by IBM). As with the preceding element, IBM's contentions refer to these as non-limiting examples of data types in which Zillow "structures advertising … such that Zillow can, and does, send the data through the World Wide Web to the user's reception system to be presented at a second portion of one or more screens of display." Ex. A at 32. Its disclosure of how "Zillow configures the advertising as objects" explicitly identifies HTTP responses that contain such data, not the data itself, as the advertising objects that Zillow configures: "The advertising, below in red, is configured as objects, such as HTTP Responses containing data, that includes advertising data, below in blue." *Id.* at 36. The color coding then associates the advertising with the HTML that the HTTP responses contain, and the advertising data with the property information and image links contained in the HTML.

Once again, neither IBM's contentions nor its brief outright assert that Zillow performs the "configuring" step by encapsulating HTML code containing property data in HTTP responses. But if that is IBM's theory, Zillow is entitled to know and rely on it, particularly in view of the point, which IBM does not address, that the "advertising objects" that it accuses Zillow of "selectively storing" in the next claim element are not HTTP responses, but property images that its theory of this element accuses of being "advertising data." *See* Mot. at 8. IBM cannot satisfy the requirement to "provide reasonable notice to [Zillow] why [it] believes it has a reasonable chance of proving infringement" by describing accused instrumentalities "in multiple inconsistent ways …." *Check Point*, 2019 WL 7801443, at *3–5 (internal quotation omitted); *see also Finjan, Inc. v. SonicWall, Inc.*, No. 17CV04467BLFVKD, 2019 WL 2077849, at *3 (N.D. Cal. May 10, 2019) (finding contentions did not provide "reasonable notice of what [was] actually accused" in part because of "the confusion that arises from defining [a component] as both part of and

1    separate from another accused instrumentality.").

2         IBM also fails to grapple with the contradiction of its position that Zillow "presents

3    advertising" by "generating data necessary to present the advertising," *i.e.*, *before sending*

4    *it over the internet*, with its position that the same advertising is "obtained from a network

5    … including a multiplicity of user reception systems" when users receive it over the

6    internet *after Zillow sends it*. Resp. at 10 (citing Ex. A at 15). But claim 1 requires

7    presenting advertising that has *already been* obtained from that network. IBM's first

8    alternative theory that the presenting is performed by third-party cache servers down the

9    line suffers from the same temporal disconnect. Its second alternative theory does not

10   equate the display of advertising by users' computers with "presenting" with the clarity

11   that the heavily altered quotation in IBM's brief suggests. *See id.*

12        IBM does not address the failure of two of its three "selectively storing" theories—

13   "content-delivery network" and "undisplayed objects"—to address all of the requirements

14   of this limitation, including that storing be "at the reception system." Resp. at 10–11. Nor

15   does it answer Zillow's charge that it has failed to explain how any of the cache-control

16   values it has identified would *cause* a browser to cache an object as it claims. It cites

17   Zillow's recognition *that* IBM is accusing setting the cache-control values of "selectively

18   storing" as conceding that Zillow understands *why*. *Id*. at 11. But the argument that Zillow's

19   "motion to strike should be denied" because it "understands" IBM's silent theory "bears

20   no weight." *Check Point*, 2019 WL 7801443, at *8; *see Geovector*, 2017 WL 76950, at *7.

21        If IBM contends that cache directives that on their face only limit how long a browser

22   can cache something actually cause the browser to store an object in the first place, it should

23   explain that. On the other hand, if it is truly IBM's theory that Zillow is responsible for

24   causing a browser to store an object by *not* issuing a directive that would *stop* it from

25   caching, IBM should own that theory by stating it clearly. Regardless, IBM has not

26   explained why it should be allowed to advance *any* theory of infringement at all for

27   infringement of the '849 patent based on users' browsers caching content received from a

28   website when this *exact issue* was determined against it in *IBM Corp. v. Booking Holdings*

1   *Inc.*, No. 2018-1574, Slip Op. at 6 (Fed. Cir. May 22, 2019).

2   It is IBM's explanations of "Zillow's remaining complaints," not the "complaints"

3   themselves, that are cursory. Resp. at 11. IBM's explanation of how the amount of

4   advertising data stored according to claim 8 is "predetermined," *id.*, does not address the

5   requirement of storing "at the [] reception systems" that Zillow's Motion identified as

6   lacking for the same reasons as for the same requirement of claim 1, or that such storing

7   be part of the step of "structuring advertising so that it may be selectively supplied and

8   retrieved at the reception systems … in accordance with" characterizations of users. Mot.

9   at 9. IBM's explanation of why the supplying of advertising is selective likewise fails to

10  address how targeting ads to users is related to the structuring of the advertising itself.

11  IBM's identification of disparate functions to satisfy elements that the claim requires to be

12  combined in a single step is the kind of "choose your own adventure" approach that is

13  "insufficiently specific" to put a defendant on notice of a definite theory. *Finjan, Inc. v.*

14  *Zscaler, Inc.*, No. 17-CV-06946-JST, 2019 WL 7589210, at *2 (N.D. Cal. Feb. 5, 2019).

15  **B.    The '346 Patent**

16  IBM's disclosures *do not* "contend[] that the claimed 'distributed data processing

17  system' *comprises* 'Facebook's servers or Google's servers ….'" Resp. at 11. This broken

18  quote misrepresents IBM's actual assertion: "Zillow manages user authentication within a

19  distributed data processing system wherein a first system, such as Facebook's servers or

20  Google's servers, and a second system, such as Zillow's servers, operate within a federated

21  computer system." Ex. D at 1. Beyond parroting the claim language, this assertion only

22  states that *either* "Facebook's servers or Google's servers" can perform the function of the

23  "first system" of the claim. It does not say that the "distributed data processing system"

24  *includes* either set of servers, or disclose if Facebook's servers and Google's servers are

25  part of the *same* distributed data processing system. The same is true of the recited

26  "federated computing environment." *Id.* at 8. Zillow's complaint is not that IBM has failed

27  to "list all of the individual computers that make up the system of environment." Resp. at

28  12. It is that IBM is hiding behind wiggle words to avoid being pinned down whether *any*

1  particular computers are part of *any* recited environment in the face of yet another Federal

2  Circuit opinion that makes this distinction crucial. *See* Mot. at 11.

3      Zillow's criticism of IBM's "identifier" theory is not that it has named so many,

4  Resp. at 12, but that, like the "advertising objects" of the '849 patent, it has failed to identify

5  any of them as corresponding to "the received identifier" for which "an identifier" is the

6  antecedent basis. The "communication logs and webpage screenshots" that IBM cites as

7  disclosing "how" Zillow "creates a user account based on the identification received from

8  Facebook [and Google]," *id.*, refer to a message stating "new Zillow account created with

9  external auth," but do not equate that "auth" with "accessToken," "id," or "email" that IBM

10  previously identified with that element. Ex. D at 39–43.[4]

11      IBM asserts that its contentions "explain[] 'how' Zillow performs the 'triggering'

12  step *by showing that* Zillow generates interfaces with selectable options (e.g., buttons) and

13  responds to selection of those options using JavaScript." Resp. at 12 (emphasis added). But

14  "showing that" Zillow performs these actions is not the same as *identifying* these actions

15  as the "triggering a single-sign-on operation of the claims." IBM does not address the

16  failure of its contentions to make that claim. *See* Mot. at 10–11. IBM's identification of

17  JavaScript code does not resolve its ambiguity about what action by Zillow corresponds to

18  the "triggering" step of the claims. Rather, IBM's cited excerpts are lengthy, contain

19  multiple functions, and are completely unexplained. Ex. D at 9-10, 13-14. *See Finjan, Inc.*

20  *v. Sophos, Inc.*, No. 14-CV-01197-WHO, 2015 WL 5012679, at *2 (N.D. Cal. Aug. 24,

21  2015) (stating that contentions referencing unexplained screenshots and/or web content are

22  generally insufficient and collecting cases).

23      Like IBM's narrative and screenshots, along with its carefully worded brief, these

24  excerpts fail to take a position on whether IBM construes "triggering a single-sign-on

25

---

26  [4] Since IBM raises the issue, it is hornbook claim construction law that a reference to "an"

27  element (with an indefinite article) that provides antecedent bases for a subsequent
reference to "the" element (with a definite article) is singular. *See Convolve, Inc. v. Compaq*
*Computer Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016). So IBM's "pick a theory" approach

28  to this claim element fails for that reason as well.

1  operation on behalf of the user" to include a sign-on operation that the user explicitly
2  requests, or one that requires an action by a user who has already been authenticated by
3  Facebook or Google to provide credential in order access resources at Zillow. IBM does
4  not counter Zillow's showing that the latter theory is precluded by the Federal Circuit's
5  decision that a single-sign-on operation does not require such an action. *See* Mot. at 11.
6  And, as shown above, it is simply wrong that issue preclusion is a premature merits issue
7  that this Court is required to ignore now. *See Blue Coat*, 230 F. Supp. 3d at 1102–04.

8       ### C.    The '443 Patent

9       IBM's contentions *do not* say: "Zillow searches for similar homes, premier lenders,
10  and/or premier agents" *by* "convert[ing] th[e] listing data to 'adTargets'" to find
11  "associated advertisements." Opp. 13 (quoting Ex. F at 12). Here is the complete passage
12  from which IBM strings together these broken pieces:

> Zillow searches for similar homes, premier lenders, and/or premier agents to locate associated
> advertisements to display to the user by using data from listing.
>
> For example, a search result item for a listing contains information about the listing, including
> home status, price, number of bedrooms and/or bathrooms, square footage, address, city, state,
> and zip code.  Zillow uses this data to search for similar listings, lenders, or agents. Zillow
> converts this listing data to "AdTargets" to search for associated advertisements.

17  Ex. F at 12. Stating that Zillow converts listing data to AdTargets *in order to search* for
18  associated advertisements does not assert that converting the listing data *is* the act of
19  searching. To the contrary, it implies that the conversion to AdTargets *precedes* the search.
20  The "specific examples of the user interface" and "computer data" similarly refer to
21  "attributes of a search result item *used to search* for associated advertisements." But this
22  too fails to identify what action by Zillow IBM accuses of being the search that uses these
23  attributes, or when it occurs. IBM also misrepresents its contentions when it states: "*Based
24  on that search*, Zillow then 'identifies associated advertisements ....'" Resp. at 13 (quoting
25  Ex. F at 17). IBM's contentions never assert that the act of identifying is performed *based
26  on* a search.

27       Nor does the assertion that "'Zillow *matches* a search result item to a list of comps'"
28  explain IBM's theory of "*matching*" for claim 15. *See* Resp. at 13 (quoting Ex. F at 97)

(emphasis added). This "explanation" is deficient not just because it parrots the claim language instead of identifying a specific action by Zillow, but also because the list of "comps" that IBM implies (without actually stating) are the "associated advertisements" in the example that follows does not pertain to the property search results that IBM implies (without actually stating) correspond to the "search result items."  That list, IBM's contentions later claim, is returned in response to "searching and retrieving" step that occurs when the user clicks on the search results to visit the corresponding property page. *See* Ex. F at 113–14. IBM's contentions never show a comp that is "matched" with a property search result and thus fail to even imply a theory for this element.

Once again, IBM's contentions *do not* state that Zillow performs the "searching and retrieving" step "'when the user submits a query,' which occurs when the graphical user interface is selected by the user." Resp. at 14 (quoting Ex. F at 113). The quoted passage states: "when the user submits the query, a request is sent to the GetSearchPageState.html endpoint on the Zillow server including information about the user's query." Ex. F at 113. This does not say what the query is or when it occurs. The only action previously identified as a "query" in the chart for this claim refers to the user's initial search, not the selection of a search result that IBM associates with the graphical user interface element. *Id*. at 89. Moreover, stating *when* a step is performed does not explain *what* corresponds to that step. And IBM's contentions do not state that Zillow's servers "search" anything in response to the request in any event. *See id.* at 113.

IBM's assertion "that the 'graphical user interface' comprises the list of search results," Resp. at 14, does not address the requirement of providing "a *corresponding* graphical user interface for *each*" search result item. Zillow's supposed understanding that its overall map search interface constitutes a GUI does not translate to knowledge of IBM's theory of why the parts of that GUI are each GUIs themselves (and is yet another irrelevant imputation of knowledge in any event. *See Geovector Corp.*, 2017 WL 76950, at *7).

IBM does not dispute that it has failed to identify any action by Zillow as the "displaying" step *beyond supplying software* that executes on a user's browser. Resp. at

14; *see* Mot. at 13. It does dispute that its characterization of that software as "wholly controlling what data is returned to the user's computer, which wholly determines" the performance of the step is "boilerplate," despite having repeated this same formulation throughout its contentions with little alteration beyond substituting claim language. But regardless, IBM does not explain how this characterization, which applies to all software programs—it is why they are called "programs"—distinguishes the Federal Circuit's repeated decisions that merely supplying software that performs a step when it is executed does not attribute performance of the step to the supplier of the software. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1221–22 (Fed. Cir. 2014); *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1335 (Fed. Cir. 2008). IBM's failure to cite a case supporting this theory of attribution reflects that it is made up out of whole cloth.

### D.    The '389 Patent

IBM does not dispute that its contentions lack any explicit identification of "layered data." It contends that the identification of "properties as 'layered data'" is implied ("[t]hus") from the statement that "[t]he 'for sale' properties layer includes properties" with various labels. Resp. at 15 (quoting Ex. H at 2). But "[i]mplicit disclosures" do not satisfy the "explicit" disclosure requirement of the local patent rules. *KlausTech, Inc. v. Google LLC*, No. 10CV05899JSWDMR, 2018 WL 5109383, at *4 (N.D. Cal. Sept. 14, 2018). Its confidence that Zillow is "surely aware" that it uses the terms "listings" and "properties" synonymously is equally insignificant for now familiar reasons. Regardless, "properties" are not "data," nor is all data about properties "listing data," and IBM does not dispute the failure of its contentions to identify what data *about* properties is "layered."

IBM's "three different examples of how Zillow meets the element of 'identifying a plurality of … attributes,'" Resp. at 15, are not an embarrassment of riches, but another "choose your own adventure" story. Each employs the word "identify" in a different sense, and none can be followed to a conclusion through all the instances in which the identified attributes resurface in the claim.

IBM's contentions do not distinguish the step of "selecting" objects from the step of

14

"matching" them to a layer by the act of setting the object's status in the JSON that is sent to users. IBM's contention for the selecting step states: "In response to a received search query Zillow selects the objects, such as listings and listing data, and sends the selection of objects to the user's browser via a JSON." Ex. H at 10. This contention recites the act of sending selected objects to a user's browser in a JSON within the step of "selecting one or more objects to be displayed in a plurality of layers." *Id*. This is inconsistent with IBM's claim that Zillow performs the subsequent step of "matching each of the objects to one of the layers" by setting values in the JSON *that has already been sent to the user as part of another step*. IBM's claim that "Zillow first 'selects' the relevant objects and then 'matches' those objects by setting their status type" does not match the sequence of operations that its contentions describe. Resp. at 15.

IBM mischaracterizes Zillow's argument that its contentions do not give limiting effect to the clause "wherein the layer order determines a display emphasis" as a premature argument about "claim differentiation." *Id*. at 16. This is a category mistake. Claim differentiation concerns the presumption that *different claims* of a patent have different scope. *See* 5A Chisum on Patents [6] (2018) ("The doctrine embodies the common-sense notion that ordinarily language of one claim should not be so interpreted as to make another claim, such as a claim dependent on the first claim, identical in scope."). Zillow's point invokes the fundamental principle of patent law that *every limitation of a claim* must be present in an accused product to establish infringement. IBM's citation of "different evidence" for the elements of "determining a layer order" and "wherein the layer order determines a display emphasis" does not address this requirement because the evidence of the latter just shows the natural effect of the former. Resp. at 16. If it is in fact IBM's theory that the "wherein" clause does not impose a further limitation on the step to which it is attached, IBM should take that position clearly by identifying the overlap of the layers as the claimed display emphasis rather than leaving Zillow to guess.

IBM's claim that Zillow displays objects on a user's device merely by "sending down" software fails for the same reason as all of its claims of attributed performance on

that basis. And its explanation that each layer has its own unique display attribute that distinguishes each from the other does not answer the question of what attribute distinguishes the objects of the "first layer" from "the other plurality of layers" collectively.

The sole example of a system component of claims 8 or 12 that IBM claims to have identified in its contentions are the screen and processor of a user's computer in connection with a single element of claim 8. Resp. at 16 (citing Ex. H at 183–84). As shown above, its claim to have done the best it could with the information available does not excuse its failure to identify the remaining system elements at all under *France Telecom*.

**E.     The '904 Patent**

Instead of responding to Zillow's argument that IBM has failed to map claimed functionality "to any part of a Zillow product," Mot. at 16–17, IBM makes the entirely inapposite assertion that it is "not obligated to identify geographic coordinates for the accused instrumentalities," Resp. at 17. Nowhere in its Motion does Zillow demand "geographic coordinates." Rather, it repeatedly points out IBM's failure to map asserted claims to a specific location *on a Zillow product*—which the express text of PLR 3-1 requires IBM to do. N.D. Cal. P.L.R. 3-1(c) (requiring identification of "specifically where each limitation of each asserted claim is found within each Accused Instrumentality").

IBM similarly does not address Zillow's argument that IBM has failed to provide any meaningful content to the terms "a promotion list" or "promotion instance." Mot. at 16. On the contrary, IBM's Response proves Zillow's point, stating that IBM has identified "promotion instances" as "listing data" stored in Zillow databases—in other words, the same broad universe of "[u]ser generated content" Zillow points to in its Motion as failing to put Zillow on notice of IBM's infringement theory. Mot. at 16. IBM again seeks to avoid providing any specific theory of infringement by framing whether its theory adheres to the PTAB's construction that was the basis for the patent's allowance as an irrelevant or premature claim construction issue. But whether IBM's theory of infringement encompasses a different construction is something that its contentions ought to disclose so that Zillow may locate corresponding prior art and join the issue. Otherwise, IBM must

1  provide contentions that map "promotion list" and "promotion instance" to a Zillow

2  according to the prior construction.

3  **F.    The '789 Patent**

4        IBM's contentions *do not* "show an 'area of the map display, in which only some of

5  the elements are selected.'" Resp. at 17 (quoting Ex. O at 22–24). The omitted portion of

6  this quote refers to "*showing the same* area of the map display" at successive times with

7  *different* elements selected. *See* Ex. O at 22–24 (emphasis added). But none of these

8  screenshots depicts "a map display … wherein *the map display comprises elements* within

9  a viewing area … wherein *the elements comprise* selected *and unselected* elements." The

10 *elements* of the *map display* at each time only comprise *one kind* of element, namely

11 *selected elements.* At no time does the map display *comprise* elements that are no longer

12 selected. Those elements are simply omitted from the map display. The same is true of the

13 "list display comprising the elements of the map display," *i.e.,* both the "selected and

14 unselected elements."

15       IBM does not dispute that none of the accused "map displays" or "lists" *show*

16 unselected elements. Instead, it chides Zillow for "assum[ing] that the claims require that

17 'unselected' elements appear." Resp. at 17 (internal quotation omitted). If it is indeed

18 IBM's theory that a *display* can *comprise elements* that are *not displayed*, then what IBM

19 contends those elements correspond to in Zillow's system is a mystery.

20       IBM's contentions also *do not* "explain [that] at the time Zillow receives a user input

21 drawing, 'the viewing area comprises elements that are visible … outside the selection

22 area.'" Resp. at 18 (quoting Ex. O at 37) (alteration by IBM). The red highlighting of the

23 text IBM omits from this contention illustrates the egregiousness of this misrepresentation:

24
25
26

The viewing area comprises elements that are visible within the map display and are outside the selection area.

As shown below outside of the black box, elements are invisible outside of the selection area.

27
28

Ex. O at 37. The screenshot that follows also does not show "the time Zillow receives a user input drawing …." Resp. at 18. That is depicted in another screenshot (Fig. 1), which clearly shows that no elements are visible inside the viewing area while the user draws the shape.



*Figure 1: Ex. O, at 35*

IBM's charts *do not* state that "send[ing] down a JSON to the users' browser with listings in a map display and a list display which are concurrently updated" *is itself* the performance of the "synchronizing step" by Zillow. Resp. at 17–18 (quoting Ex. O at 44). Indeed, elsewhere its contentions indicate that the "synchronizing" occurs when the browser display is refreshed, not when Zillow sends the JSON. *See* Ex. O at 47 (citing video of browser refresh as "showing Zillow synchronizing the map display and the list display ….").

IBM again claims to have identified the system components recited in the asserted system claims "with 'as much specificity as possible with the information currently available to it.'" Resp. at 18 (quoting *France Telecom*). But it does not dispute that this amount of "specificity" is none at all.

### G.    The '183 Patent

Zillow does not just "*contend[]* that 'a computer processor' means 'a single computer processor'" in the '183 patent. Resp. at 18 (emphasis added). As a matter of Federal Circuit law, where a claim "recites 'a processor' in the preamble before recitation of 'comprising,' and the claim body uses the definite article 'the' to refer to the 'processor,'" the "reference to 'the processor,' referring back to the 'a processor' recited in preamble" means "the same processor." *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016). That "IBM disagrees" with the Federal Circuit about this

is not a reason to allow it harass Zillow with discovery based on a theory that is objectively futile. And even if *Convolve* did not foreclose IBM's "multiple processor" theory, that theory is not disclosed in IBM's contentions, which fail to identify any computer processors at all.

IBM does not dispute that none of the evidence it cites about incorporating information into Zillow's Zestimate "in real time" or "immediately" refers to image data. Resp. at 18–19. This evidence therefore fails to explain what action IBM is referring to with the repeated claim language when it states that "Zillow retrieves image data for incorporation into the Zestimate calculations automatically, as soon as new home images are retrieved and stored in Zillow's living database." Ex. T at 9. It also fails to *explicitly* disclose whether IBM's theory "of retrieving in real time … image data *associated with a plurality of locations*" is satisfied by retrieving the data as soon as it is available, even if, as in the case of real-estate listing photos, the association between the data and the location is not a present one at the time of retrieval. If so, IBM's theory of how "condition score values" calculated from that data "indicate real time condition values associated with said plurality of locations" is another mystery.

IBM's contentions *do not* state that "that the 'image data' *is* the 'unstructured' form of the images, *which have been* 'filtered and analyzed for relevant elements' *that Zillow stores* after receiving the images." Resp. at 19 (quoting Ex. T at 9). The unaltered source for this assertion shows that this assertion misrepresents IBM's contentions on many levels:

> Zillow's image data retrieval systems take homes images from Zillow's living database and convert said images into image data, which the specification of U.S. Patent No. 9,245,183 discusses as data from images that is used to generate unstructured data that is filtered and analyzed for relevant elements.

Ex. T at 9. First, this passage does not say that image data is the unstructured form of the images. It says that image data is "data from images that is *used the generate unstructured data* …." It does not state that it is the image data (or the images—it's unclear) is what has been filtered or analyzed for relevant elements. It is the unstructured data that the image data is used to generate that is filtered and analyzed. And finally, this passage does not identify image data that "Zillow stores." It discusses how image data is used in the

19

specification of the asserted patent. None of this identifies what image data *is*, even as a general matter, much less within the context of Zillow's systems.

IBM's contentions also *do not* identify "unstructured data corresponding to various 'home attributes' present in the original images" as a "specific example" of "image data." Resp. at 19 (quoting Ex. T at 17). The source of this quotation reads:

> The different home attributes that are present in the image data, such as finish quality, granite countertops, remodeled bathrooms, updated fixtures, well-landscaped backyards, spacious patios, remodeled kitchens, chef-worthy appliances, quality of windows, natural light, and fireplaces, among many others, are assigned a quality score by Zillow's neural network model.

Ex. T at 17. IBM's chart does not refer to "unstructured data" or identify what corresponds to the "image data" in which the cited "home attributes" are supposed to be present. And the evidence that this passage introduces refers to training a convolutional neural network ("CNN") to "see" features *in the photos themselves*, not in any "unstructured data" corresponding to those attributes derived from those photos:

> photos of a home and get the same information that humans do. Now, we've taught the Zestimate to discern quality by training convolutional neural networks with millions of photos of homes on Zillow, and asking them to learn the visual cues that signal a home feature's quality. For instance, if a kitchen has granite countertops, the Zestimate now knows — based on the granite countertop's pixels in the home photo — that the home is likely going to sell for a little more.

*Id.* at 18 (excerpting IBM-ZILLOW10000294). Since the one thing IBM's contentions *are* clear about is that "original images" are not "image data," its theory about how Zillow uses "image data" to infringe this patent remains unexplained.

In the absence of any identification of what image data is or how it is used in the context of Zillow's accused systems, IBM's untethered assertion that "new image data may be compared against the store of image data by feeding said image data into the CNN" does not frame a dispute about whether the "comparing" step is present. Resp. at 19. Rather, it invites the question of what neural network IBM is talking about, since the evidence it chose to use to explain its infringement theories only refers using a neural network to process something that IBM contends is not image data.

Finally, IBM's contentions *do not* identify the "algorithm" in the "computer program

product" of claim 20 as "'code, such as HTML, JavaScript, CoffeeScript, Ruby, and Java' that Zillow sends to the user." Resp. at 19 (quoting Ex. T at 79). Once again, to the tape:

> Zillow's Website comprises servers that are a hardware storage device readable by the computer, including components such as hard drives, solid state drives, flash memory, and RAM that embody instructions which include code, such as HTML, JavaScript, CoffeeScript, Ruby, and Java, comprising an algorithm that is executable by the computer to provide the claimed method.

Ex. T at 79. This does not assert that the algorithm is the (generic server) "code," but that the code "comprises" the algorithm, which IBM helpfully identifies as the one that infringes the claims. IBM does not dispute its failure to identify any other software or system elements of this patents, and its gripe that Zillow is "hiding behind its confidential source code and backend servers" merits little sympathy in comparison to Zillow's frustration at being accused of infringing and put to the effort of moving to strike claims that IBM now concedes it lacked any basis to assert.

## IV.    IBM'S ALTERNATIVE THEORIES

### A.    IBM improperly relies on representative charts.

IBM's defense of its representative claim charts rests first and foremost on its assertion that it has provided "multiple examples of infringement based on a single product: Zillow's Website." Resp. at 20. But this fails to save its insufficient charts because, as explained above, "Zillow's Website" is not actually defined by IBM as any single discernable product. *See supra*, Pt. II. Thus, while IBM argues that it "identifies how the website meets the claim language then provides specific examples," the illustrations it points to simply prove Zillow's points: IBM cites to its chart for the '443 patent, in which it purports to show that "associated advertisements are made with access to an information repository" and identifies an "information repository, such as, for example, Zillow's living database," which IBM then indicates with a screenshot of Zillow's "Living Database of 110M Homes." Ex. F at 6. Yet IBM also contends that the "associated advertisements" targeted in a search are not just homes, but also "premier agents and/or premier lenders." *Id*. at 2. IBM's representative chart does not indicate how agent or lender advertisements "are made with access to an information repository," it just asserts that they are. The

1   insufficiency is a consequence of IBM's artificial definition of "Zillow's Website" as a

2   single product or service, when IBM's own contentions reveal that it is not.

3          IBM's only other example in defense of its use of representative charts fares no

4   better: It points to its "[i]dentification in Exhibit B . . . of Zillow's 'Properties application,

5   which includes interactive services, such as search for rental properties,'" and subsequent

6   examples of "the interactive services in four mobile applications," namely  "Zillow iOS,"

7   "Zillow Rentals iOS," "Zillow Android," and "Zillow Rentals Android." Resp. at 21. But

8   IBM's own contentions then allege that "Zillow's Mobile Applications includes additional

9   applications, including at least:" "Properties," "Home Loans," and "Agent Finder," and

10  further state that "Zillow treats each of these applications as separate product lines, and

11  treats them as distinct applications," then note distinguishing features of the "Properties"

12  application. Ex. B at 55. IBM does not address how its representative chart sufficiently

13  applies to these "additional applications" that are part of "separate product lines."

14         With respect to its vague assertion of infringement by past iterations of Zillow's

15  website, IBM argues that it cannot provide more specificity because website versions are

16  not numbered. Resp. at 21. First, this ignores that Zillow's mobile applications *are* released

17  by public version number, *see supra*. Second, an absence of numbered versions for

18  Zillow's website does not excuse IBM from specifying how that website's evolving

19  functionality has infringed in the past. IBM concedes that Zillow's website is continually

20  changing, Resp. at 21; yet its infringement contentions make the blanket assertion that

21  Zillow's website has performed the asserted method "in the same or similar manner since

22  at least September 2013," providing in support of this statement only screenshots from

23  2017 and 2018. Ex. F at 6–7. This does not put Zillow on reasonable notice of why or how

24  IBM believes Zillow's website infringed in a "similar manner" as of September 2013.

25         **B.   IBM's indirect and attributed infringement contentions are insufficient.**

26         IBM tries to distinguish its conclusory allegations of indirect infringement from the

27  contention that "others run" accused software that was found insufficient in *Cap Co., Ltd.*

28  *v. McAfee, Inc.*, No. 14-cv-05068, 2015 WL 4734951 (N.D. Cal. Aug. 10, 2015), but does

1  not explain how the steps it presents are meaningfully different from the assertion that

2  "others run" an asserted software product; rather, IBM simply reiterates its prior

3  description of the functionality that is effectively "run." In short, IBM "merely restates its

4  general theory of direct infringement" and notes that there is an end user. *France Telecom*,

5  2013 WL 1878912, at \*5. This is insufficient to identify indirect infringement. *See id.*

6      With respect to the nine claim charts identified by Zillow for the '389, '789, and

7  '183 Patents, Zillow's Motion explains that these charts do not identify the charted

8  products as *themselves* "Accused Instrumentalities," and IBM's Response does not

9  disagree: On the contrary, IBM doubles down on its characterization of "Zillow Group

10  Media," "Zillow Offers," and "Promoted Communities" as not themselves infringing, but

11  rather as purportedly "encourage[ing] users to infringe by using *other accused products*."

12  Resp. at 22 (emphasis added). IBM's emphasis on the supposed specificity of its charts

13  misses the point: The charts for those patents do not show that the identified products

14  themselves infringe, whether directly or indirectly. Those products therefore cannot

15  themselves constitute "Accused Instrumentalities."

16      As for IBM's repeated assertions that performance of infringing acts is "attributable"

17  to Zillow, IBM points to a single example of what it claims to be "element-by-element

18  allegations of attributed infringement." Resp. at 23. But IBM's selective quoting from that

19  example provides a false impression of clarity. Read in its entirety, the relevant passage is

20  a jumble of what IBM contends are "multiple theories" and is replete with conclusory

21  assertions and the non-specific phrases "and/or," "such as" and "because, for example."

22  Ex. H at 77–78. A similar morass of allegations is copied in multiple of IBM's charts. *See,*

23  *e.g.*, Ex. A at 21–22; Ex. C at 17. Regardless, these allegations all boil down to the claim

24  that Zillow performs steps on users' computers when they execute its software. As shown

25  above for the "displaying" element of the '443 patent, this theory has no basis in law.

26      **C.   IBM improperly asserts the doctrine of equivalents.**

27      IBM's Response does not overcome its improper assertion of the doctrine of

28  equivalents as a catch-all theory for it to fall back on should its literal infringement theories

fail. *See* Mot. at 22-23; *see also Finjan v. Sophos*, 2015 WL 5012679, at *4 (holding a plaintiff must state its theory under the doctrine of equivalents with specificity or "drop the contention altogether" (citation omitted)). IBM highlights one "161-word explanation," but does not squarely address Zillow's argument that that explanation merely reformulates the literal infringement allegations. Resp. at 24. Indeed, IBM underscores this very point, noting that its doctrine of equivalents contention "also references four pages of literal infringement allegations." *Id*.

IBM further cites to a handful of instances in which it purports to have explained the basis for its infringement theory under the doctrine of equivalents for a given element. *Id*. (citing Ex. A at 30, 36; Ex. D at 22, 80). Zillow disagrees that these allegations sufficiently apprise Zillow of IBM's equivalence theory, *see* Mot. at 22–23; but even were they found adequate, this does not justify IBM's blanket contention that "to the extent that *any* claim element is found not to be literally met with respect to the Accused Products, IBM contends that the element is met under the doctrine of equivalents" because "there are no substantial differences for each claim element," and "the Accused Products perform substantially the same function, in substantially the same way, to achieve substantially the same result" for each and every asserted claim. Ex. Z at 7 (emphasis added); *see, e.g., Finjan, Inc. v. Sophos,* 2015 WL 5012679, at *3 (striking blanket assertion of equivalence from plaintiff's Rule 3-1 cover pleading); *Finjan, Inc. v. Proofpoint, Inc*., 2015 WL 1517920, at *10 (same). As the *Proofpoint* court explained, a party may not simply assert the doctrine of equivalents as a fallback position for all claims. 2015 WL 1517920, at *10. Rather, "[i]f a plaintiff does not have a factual basis to assert the doctrine of equivalents in its infringement contentions at that time, it should not do so." *Id*. IBM's broad assertion of the doctrine of equivalents as a catch-all for "any claim element" not found to be literally infringed should be struck.

## V.   DISCOVERY SHOULD BE STAYED

IBM's Response does not even acknowledge, let alone address, any of the multiple cases cited in Zillow's Motion holding that a patent plaintiff subject to the Northern District of California's Patent Local Rules is not entitled to discovery from a defendant until it has

24

1   served sufficient infringement contentions, and that courts thus "routinely stay discovery

2   *until* the plaintiff has met its Rule 3–1(c) obligations." *See* Mot. at 24–25 (quoting *Shared*

3   *Memory*, 2011 WL 3878388, at *7 and citing additional cases (emphasis by the court)).

4   Rather, IBM's only argument against a stay of discovery is that Zillow has not yet answered

5   IBM's interrogatories and IBM had a pending motion to compel its responses. Resp. at 24–

6   25. IBM's motion to compel has now been denied. ECF. No. 91.

7       Courts applying the Patent Local Rules have made clear that a plaintiff has no

8   entitlement to infringement-related discovery from a patent defendant prior to identifying

9   Accused Instrumentalities; rather, it is the identification of those Accused Instrumentalities

10  in accordance with PLR 3-1 that defines the scope of appropriate discovery. *See Shared*

11  *Memory*, 2011 WL 3878388, at *7; *see also FusionArc*, 2007 WL 1052900, at *3 ("Rule

12  3–4 requires only production of documents sufficient to show the operation of defendant's

13  systems 'identified' in the Rule 3–1 disclosures."). Judge Early's Order reflects this,

14  denying IBM's Motion without prejudice to renewal subject to this Court's ruling on the

15  sufficiency of IBM's contentions. ECF No. 91 at 6.

16  **VI.   AMENDMENT FOR GOOD CAUSE**

17      IBM's Response seeks leave to amend its infringement contentions in the event this

18  Court finds them insufficient, but it provides no showing of good cause to do so. Resp. at

19  25. Patent Local Rule 3-6 permits amendment of infringement contentions "only by order

20  of the Court upon a timely showing of good cause." If IBM believes it has a factual basis

21  for amendments that would cure the deficiencies identified by Zillow, it should be required

22  to file a motion to amend demonstrating the basis for that amendment and providing Zillow

23  the opportunity to respond on whether such amendment would be futile. *See Theranos, Inc.*

24  *v. Fuisz Pharma LLC*, No. 11-CV-05236-YGR, 2012 WL 6000798, at *7 (N.D. Cal. Nov.

25  30, 2012) (striking infringement contentions as insufficient under PLR 3-1 and stating

26  plaintiff "must file a motion for leave to amend its infringement contentions if it seeks to

27  proceed with their infringement claims").

28

1    Dated: April 17, 2020

2                                         /s/ *Ian B. Crosby*
                                          Marc M. Seltzer (SBN 54534)
3                                         SUSMAN GODFREY L.L.P.
                                          1900 Avenue of the Stars, Suite 1400
4                                         Los Angeles, California 90067
                                          Telephone: (310) 789-3100
5                                         mseltzer@susmangodfrey.com
6

7                                         Ian B. Crosby (admitted *pro hac vice*)
8                                         Daniel Shih (admitted *pro hac vice*)
                                          Katherine M. Peaslee (SBN 310298)
9                                         SUSMAN GODFREY L.L.P.
10                                        1201 Third Avenue, Suite 3800
                                          Seattle, WA 98101
11                                        Telephone: (206) 516-3880
12                                        icrosby@susmangodfrey.com
                                          dshih@susmangodfrey.com
13                                        kpeaslee@susmangodfrey.com
14
                                          *Attorneys for Defendants Zillow Group,*
15                                        *Inc., and Zillow, Inc.*
16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 8:19-CV-01777-JLS-JDE

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<div align="center">

*/s/ Ian B. Crosby*
Ian B. Crosby

</div>